STATE OF MARYLAND, DEPARTMENT OF GENERAL
SERVICES

*v.* CHERRY HILL SAND AND GRAVEL COMPANY,
INC.

[No. 593, September Term, 1981.]

*Decided April 7, 1982.*

The cause was argued before MORTON, MASON and COUCH, JJ.

*Varda N. Fink, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Thomas A. Baker, Assistant Attorney General,* on the brief, for appellant.

*Douglas G. Worrall,* with whom were *Smith, Somerville & Case* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court.

The State of Maryland, through its Department of General Services, appellant and cross-appellee herein, solicited bids from construction contractors to construct a fish hatchery on the grounds of Cedarville State Park in Anne Arundel County. The plans and specifications as prepared by Frederick Ward Associates, Inc., required the clearing, excavation, and grading of a large site and the lining of 27 excavations which would become ponds.

Several interested contractors, including Cherry Hill Sand and Gravel Company, Inc., appellee and cross-appellant herein, before putting in their bids, inquired of David Hall, an employee of Frederick Ward Associates, Inc., whether there was on-site "impervious fill" sufficient to line the 27 excavations as required. Mr. Openshaw, the president of Cherry Hill, and at least one other inquiring contractor were advised that there was. Cherry Hill prepared its bid, a component of which was $194,920, a $4 per cubic yard charge for placing, compacting, and shaping an estimated 48,730 cubic yards of borrow, or "impervious fill." Cherry Hill, acting on the assumption that all the impervious fill needed was on the site, did not include in its estimate a cost for hauling the fill or other costs associated with hauling fill from an off-site area.

Cherry Hill was awarded the contract. The written contract entered into between the parties provided, at Paragraph 2B-9a, that the contractor was to supply the fill required where cuts did not provide sufficient materials. No representation was made within the written contract that sufficient quantities were available on site.

During construction it became apparent that there was very little borrow on-site which met the requirements of impervious fill, and Cherry Hill was forced to retrieve 45,997 of the 49,941 cubic yards needed from areas 800 to 1500 feet "off-site" — away from the ponds — thus incurring additional costs.

Cherry Hill filed a declaration in the Circuit Court for Anne Arundel County (WILLIAMS, J.) against the State of Maryland, Department of General Services, first alleging that it incurred the additional expense of hauling the fill and was owed $321,979 under the contract, based on a figure of $7 per cubic yard for 45,997 cubic yards of borrow.

The trial judge in an oral opinion issued at the end of the trial concluded that the oral representation made to Cherry Hill two days before bids were accepted was a part of the written contract which followed. He awarded as damages for the State's breach $1.96 per cubic yard for the hauling of

46,041 cubic yards and the cost of opening and closing two "pits," in addition to $1,665.84 to repair a cable in one of the pits that Cherry Hill was forced to use.

The State herein appeals the final judgment entered in favor of Cherry Hill in the amount of $91,906.20, arguing that the court erred in ruling that the contract between the parties contained an oral representation made by the State engineer prior to the time that the parties entered into a written contract. It argues that under the parol evidence rule, the prior oral assertion made by Hall that there was sufficient on-site impervious fill is not admissible to vary, alter, or contradict the complete and unambiguous written contract later entered into by the parties. Indeed, argues the State, such parol evidence would not be admissible even to explain the meaning or determine the construction of a writing susceptible as this is to a reasonable construction.

The contract, appellant asserts, was clear and unambiguous:

*"2B9 Borrow and Surplus Cut*

a. When sufficient materials are not available from cuts to establish the required grading, the contractor shall supply the fill required . . . .

b. The Contractor shall note that some fill, if required, is available from the site designated 'Borrow Area' as shown on the drawings unless otherwise directed . . . ."

As such, parol evidence of a prior representation to the contrary was not admissible. For support, appellant relies on the case of *Delmarva Drill Co. v. Tuckahoe Shopping Center,* 268 Md. 417 (1973), where the Court of Appeals held inadmissible an oral statement by a drill company employee to appellee that usable water would be found, whereas a written contract subsequently entered into between the company and appellee specifically disclaimed any guarantee as to water quality. Judge Levine, quoting several of his predecessors, stated, at 426:

" '[P]arol evidence is inadmissible to vary, alter or contradict a writing which is complete and unambiguous, where no fraud, accident or mistake is claimed, [citation omitted] but where doubt arises as to the true sense and meaning of the words themselves or difficulty as to their application under the surrounding circumstances, the sense and meaning of the language may be investigated and determined by evidence *dehors* the instrument.' "

Appellee corporation initially raises the threshold issue of waiver. It argues that after appellant objected to Openshaw's testimony that he was "assured" by Hall that there was sufficient impervious fill, it called Hall to the stand and questioned him on the alleged conversation, thus waiving its prior objection to the evidence of that conversation.

The record reflects that the appellant did indeed solicit this testimony from its witness Hall:

"Q. Now, Mr. Openshaw in his testimony stated that he had a phone call with you on or about March 15, 1977 . . . .

. . . .

Q. What was said in the conversation between you and Mr. Openshaw?

A. Are you talking about the alleged . . .

Q. The one that . . .

A. . . . in March?

Q. Yes.

A. Well, for one thing, let me set the record straight. I do not recall every [sic] talking to Jim Openshaw before the bids."

Hall testified that he did, however, recall talking to one of Openshaw's estimators, Mr. Vonella, about the borrow. He told Mr. Vonella that it was Vonella's responsibility to determine whether there was sufficient impervious material on-site and that he would guarantee nothing, but that his

"gut reaction, off the record" was that there was enough material in and beyond the area of the pond.

While appellee acknowledges that appellant need not "play the ostrich and simply ignore the evidence" admitted over its objection in order to preserve the issue for appeal, *City of Baltimore v. Smulyan,* 41 Md. App. 202, 219 (1979), it argues that appellant's actions at trial exceeded allowable bounds. In *Smulyan,* Judge Wilner, speaking for this Court, alluded to those bounds, at 219:

> "[Appellant] may cross-examine . . . the witness about the evidence, *Peisner v. State,* 236 Md. 137, 144 (1964), and make other reasonable efforts to show that the evidence, admitted over his objection, should nevertheless be discounted or disregarded by the trier of fact. This is all that [appellant] did in this case, and it is *quite different from soliciting* (or failing to object to) *the independent reception of the same evidence, from which a waiver may be implied.*" (Emphasis supplied.)

We agree that a party may, under some circumstances, waive his objection to testimony by subsequently offering testimony on the same subject. *Peisner v. State,* 236 Md. 137 (1964). The rationale, as noted in *Linkins v. State,* 202 Md. 212, 224 (1953), is that "[i]f inadmissible evidence is admitted over objection, or produced by the party who objected, the error is harmless."

We do not think, however, that the general rule of *Peisner* and *Linkins* is applicable under the facts of this case. Any error made in the admission of Openshaw's testimony was not rendered harmless by Hall's complete denial on direct examination. Rather, that denial was a "reasonable effort" on the part of appellant to show that Openshaw's testimony "should nevertheless be discounted or disregarded." In our view there was no waiver by appellant.

Having found no waiver, we now deal with the substance of the parol evidence rule. In *Whitney, Exec. v. Halibut,* 235 Md. 517, 527 (1964), the Court, quoting from 3 Corbin, Contracts § 573 (rev. 1960), stated:

" 'When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing.' "

The statement of the rule suggests the limitations of its application. The parol evidence rule only applies where the parties to a written contract agree or intend that the writing shall be their whole agreement. 4 Jaegar, Williston on Contracts § 633 (3d ed. 1961); 32 A. C.J.S. *Evidence* § 945 (1964); 3 Corbin, Contracts § 582 (1960). Whether it is applicable in this case requires an initial substantive determination of what constitutes the final and integrated agreement of the parties. *See* Restatement (Second) of Contracts §§ 213, 214. Appellee argues, and the trial judge agreed, that the representation made by appellant's engineer to Openshaw was an oral clarification meant to be incorporated as part of the contract.

As specifically provided for in the definitional section of the Department of General Services contract:

"The Contract Documents consist of the Agreement, the General Conditions, Supplementary Conditions, *Instructions to Bidders,* Proposal, Bond, the Drawings and Specifications, all Addenda duly issued prior to submission of bids, all Change Orders duly revised, and any amendments to the contract duly executed by both parties. These form the contract." (Emphasis supplied.)

The "Instructions to Bidders" clause, expressly made a part of the contract, includes this paragraph:

"7. Discrepancies

Should a bidder find discrepancies in the plans and/or specifications or should he be in doubt as to the meaning or intent of any part thereof, he must,

not later than seven (7) days (Saturdays and Sundays excluded) prior to the bid opening, request clarification from the Architect, who will issue an addendum or otherwise clarify the matter. Failure to request such clarification is a waiver to any claim by the bidder for expense made necessary by reason of later interpretation of the contract documents by the Architect."

An addendum, as defined in the contract,

"is the form of clarification amending or interpreting the Contract Document issued by the Architect prior to the receipt of the bids."

Appellee maintains that the above cited contract language, in conjunction with the conspicuous lack of an integration clause, indicates that the parties contemplated that pre-bid clarifications such as the one given by appellant's agent Hall to appellee were to be incorporated into the contract, and the contract does not require these clarifications to be in writing. Since the parties, according to appellee, did not consider the written contract to be the complete and accurate integration of their agreement, parol evidence was admissible to prove the terms and conditions of that agreement.

Appellee asserts that this case is distinguishable from *Highway Const. Co. v. Miami,* 126 F.2d 777 (5th Cir. 1942), in which oral statements or clarifications made prior to bidding were held not admissible to change, contradict, or vary the written contract where the contract expressly provided that the contracts were to be fully written. In *Highway Const. Co.* the contract provided that "work and dimensions must be in strict accord with [the engineer's interpretation of the plans, specifications and contract] except only when the Director of Public Service may in writing authorize an exception." This contract language and similar language in the Charter of the City of Miami made it "exceedingly clear" to the court that "the parties intended, agreed, and understood that their contracts were to be fully written."

We are of the view that the distinction between *Highway*

*Const. Co.* and the case at bar is significant. Not only is there no express language in the contract before us precluding oral clarifications, but the contract language strongly suggests that such oral clarifications are anticipated. The instructions to bidders, expressly made a part of the contract, set forth a procedure whereby appellee and any other prospective bidder could obtain clarification and other additional information from appellant's engineer. At least one other hopeful bidder used this process and was given the same information regarding the availability of impervious fill.

Also significant is the absence of an integration clause in the contract. The parties could have indicated in the written contract that the writing was to be a complete integration of their agreement or that there was a partial integration as to the item at issue; however, they did not do so. *See* Williston on Contracts, §§ 633-636. Despite the specific provision in the written contract that the contractor had to supply its own impervious fill, *see* IX Wigmore, Evidence § 2430 (3d ed. 1940), the above two factors militate against a conclusion that the written contract appeared on its face to represent all of the transaction as to that element. Because the agreement appears not to be complete, the trial court did not err in looking to the extrinsic evidence of prior oral assertions by Hall in order to determine whether the contract was an integrated one and, if not, what were its terms. *See* Restatement (Second) of Contracts § 214.

The State, in its appeal, also raises the issue of sovereign immunity. It argues that the alleged oral statement created an obligation on the State not created in the written contract; that in so finding this obligation, the court substituted an oral contract for a written contract; and that in light of the fact that the Maryland General Assembly has waived the State's sovereign immunity defense only for written and not oral contracts, [1] no damages could properly be assessed against the State in this case.

---

1. *See* Md. Ann. Code, art. 21, § 7-101, effective July 1, 1981, formerly art. 41, § 10a.

As we see it, appellee filed an action in contract based upon a written contract. The fact that appellee's claim relies on an oral statement made during the bidding period to explain the contract does not transform that written contract into an oral contract.

The State next protests a lack of evidence of any damages sustained by appellee. It argues that the unrebutted testimony of an expert witness for the State was that there should not reasonably have been any increased costs incurred by appellee in having to haul suitable fill from pits located 800 to 1500 feet away as opposed to it being on-site, because more efficient machinery was used to make those hauls than would have been used to "shuffle dirt" around in the immediate area.

This evidence was not only disputed, it was expressly disbelieved by the court. The trial judge found the State's expert's testimony "somewhat confusing" and "didn't think that [he] really meant to say that it would cost less to bring dirt from fifteen hundred yards away and put it in place . . . than it would if he was able to just shove it over there . . . from a hundred feet away."

Appellee, on the other hand, presented evidence that the fair and reasonable cost of transporting impervious fill from the borrow pit to the construction site was ninety-seven and one-half cents per cubic yard. The State's expert witness agreed, on cross-examination, that it was a fair and reasonable cost for hauling. Openshaw testified that when the cost to him of preparation of the borrow pits was also considered, total additional cost to him was $1.96 per cubic yard.

We cannot say that the trial court was clearly erroneous in finding appellee's witnesses' testimony more credible.

## Cross-Appeal

Cherry Hill submitted a second claim to the State for damages incurred as a result of the State's failure to provide permanent electrical service to the job in a timely fashion. We turn now to that claim.

The initial work under the contract began with written authorization from the State on July 21, 1977, and was to be completed under the terms of the contract by July 25, 1979, 730 calendar days later. Cherry Hill was to supply all temporary power needed during the construction period and the Southern Maryland Electric Company (hereinafter SMEC) was to provide all permanent service once the State furnished it such information as power requirements and location, and paid a fee.

In the fall of 1977 upon the completion of one of three buildings, Cherry Hill requested of the State electrical service to provide cold weather protection. The State declined because it was clear that Cherry Hill was obligated to provide whatever temporary electrical service was needed during construction. When Cherry Hill was nearing completion of the project, it informed the State by letters dated October 6 and October 19, 1978, that if permanent electrical service was available, among other things, to operate the pumps in order to fill the ponds, the project could be completed in mid-December. Openshaw testified that he needed the permanent power hook-up before the job could be certified by the State: the temporary generators were not sufficiently powered to operate the wells or heat the building, and it made more sense that the State install its permanent system than for him to install another more powerful temporary system for that purpose. Because the service was not provided, Openshaw testified, the ponds remained unfilled and final work, such as landscaping, seeding, and painting remained uncompleted through the winter months. Cherry Hill informed the State that if the power was not provided it would shut down operations and it did do so until the spring. In May, 1979, SMEC was able to provide electrical service and all work was completed by Cherry Hill at that point with the exception of a "few punch list items" which were completed in July.

Cherry Hill, in the first count of the declaration filed against the State, alleged that because the State failed to fulfill its obligation under the contract to provide such electrical service, it incurred additional costs in the form of

extended overhead costs through the winter as well as damages incurred due to winter weather. Specifically, Cherry Hill claims the cost of heating the buildings during the winter of 1978-79, cleaning up after a gas heater broke, and labor and overhead costs incurred after December, 1978. The trial court, in denying the claim, stated that while Cherry Hill's job was "very near completion almost six months before it was contemplated to be finished," there was "no affirmative obligation on the part of the State to put electrical power in before any particular time. . . ." Because the outside completion date of July 21, within which work was to be completed, had not yet come to pass and because Cherry Hill was obligated to provide any temporary power needed during construction, the trial court concluded that the State did not have to accept the nearly completed job in December, 1978, and ensure that electrical service was promptly provided.

Cherry Hill, cross-appealing that decision, argues that the State was obligated, as a matter of law, to cooperate in the successful completion of the contract. "It would be sad commentary on the law," it argues, "to permit dalliance by the State to penalize a prompt and efficient contractor by requiring the contractor to sit on its hands for many months accomplishing nothing productive waiting for the State to do what it agreed to do, where no reason exists for such dalliance."

Indeed, it would be if such were the case. As one sister court aptly put it, "an owner may not prevent a contractor's early completion of his assignment with impunity." *Housing Authority v. E. W. Johnson Const. Co.,* 264 Ark. 523, 573 S.W.2d 316, 323 (1978).

It is well settled that "one delayed in the execution of a contract as the result of a default by the other contracting party would be entitled to recover damages thus sustained." *Dewey Jordan, Inc. v. Md. Nat'l Cap. P. & P. Comm.,* 258 Md. 490, 497 (1980). Even where a contractor has completed his project within the time alloted under the contract, the other contracting party may be liable in damages for additional expenses realized where it causes delay in completion, such

as where the owner breaches its implied warranty to provide accurate and reliable plans and specifications, *Housing Authority, supra,* or where a supplier delivers defective materials, *see District Concrete Co. v. Bernstein Concrete,* 418 A.2d 1030 (D.C. App. 1980).

Although we believe the trial judge was wrong in concluding that the State would under no circumstances have any obligation to accept the work at any time before the expiration of the 730 days, we find that the trial judge was not clearly erroneous in concluding that under the facts, the State was not obligated to accept the buildings and ponds as they stood in December, 1978.

There was evidence that Cherry Hill had not provided temporary power, as was required in the contract, sufficient to test the pumping equipment it had built. Such testing, and presumably the filling of the ponds using those pumps, was required of the contractor under the contract. The State argued that Cherry Hill was attempting to impose on the State not merely a duty to cooperate but a duty "to do Cherry Hill's work."

The trial court, agreeing that Cherry Hill was obligated under the contract to test the equipment and that it could not do so with the temporary power it had provided, was therefore not clearly erroneous in concluding that the State was not obligated to install permanent power as early as December, 1978.

*Judgment affirmed.*
*Costs to be divided equally between*
*appellant and appellee.*