681 A.2d 609

**John C. CALHOUN**

v.

**James K. EAGAN, Guardian of the Property and Next Friend of Laura M. Calhoun and Kevin J. Calhoun, Minors.**

**No. 1723, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

Aug. 30, 1996.

Certiorari Granted Dec. 23, 1996.

Emile J. Henault, Jr., Glen Burnie, for Appellant.

Gary S. Peklo, Ellicott City, for Appellee.

Argued before HARRELL, HOLLANDER and EYLER, JJ.

HOLLANDER, Judge.

██ This case requires us to examine the doctrine of parent-child immunity, which has been part of the law of Maryland since 1930. *See Warren v. Warren,* 336 Md. 618, 622–28, 650 A.2d 252 (1994); *Schneider v. Schneider,* 160 Md. 18, 21–23, 152 A. 498 (1930). Generally, it proscribes parents and their unemancipated children from asserting civil claims against one another. The Court of Appeals has, however, recognized an exception to this doctrine, which allows a child to sue a parent for "cruel and inhuman treatment or for

malicious and wanton wrongs." *Mahnke v. Moore,* 197 Md. 61, 68, 77 A.2d 923 (1951). That exception is central to this case.

In 1994, James K. Eagan, appellee, the court-appointed guardian of the property of two minor children, Laura M. Calhoun and Kevin J. Calhoun, filed a wrongful death action against John C. Calhoun, appellant, in the Circuit Court for Howard County. He alleged that appellant, the father of Laura and Kevin, deliberately or recklessly killed Gladys E. Calhoun, appellant's wife and the children's mother. Appellant contended that the action was barred by parent-child immunity. The circuit court disagreed, ruling that Calhoun's conduct fell within the *Mahnke* exception. Thereafter, a jury found in favor of the children and awarded them $2,360,000 in damages. The jury, however, was unable to reach a verdict on the issue of whether appellant's actions "were atrocious, show[ed] a complete abandonment of the parental relation, were intentional, were willful and were malicious." Nevertheless, the circuit court determined that this inability was of no consequence and entered judgment in favor of appellee.

Calhoun now appeals and presents two questions for our consideration:

I. Did the Court err by not enforcing the parent-child immunity law of the State of Maryland in favor of Appellant and in denying Appellant's Trial Motion for Summary Judgment and Motions for Directed Verdict?

II. Did the failure of the jury to reach a verdict on question 2 of the verdict sheet substantiate that Appellant's conduct was within the framework of parent-child immunity?

■ We conclude that it was a question for the jury as to whether appellant's conduct was cruel and inhuman or wanton and malicious, so as to fit within the *Mahnke* exception. Therefore, the circuit court erred in ruling upon the issue as a matter of law. Moreover, the jury was unable to reach a verdict on that critical issue. Therefore, we shall reverse the judgment and remand the case for a new trial.

## *FACTUAL SUMMARY* [1]

John and Gladys Calhoun were married on June 15, 1974. The couple had two children: Laura, born on October 4, 1980 and Kevin, born on July 23, 1982. The Calhouns both worked for the National Security Agency ("NSA"). They experienced difficulties in the marriage; appellant conceded that he had an extramarital affair with a co-worker at the NSA, which family members knew about and Ms. Calhoun suspected.

The events at the center of this case occurred on May 13, 1992. That afternoon, the Calhouns decided to clean the gutters of their home. Appellant leaned a ladder against the side of the house, and Ms. Calhoun climbed the ladder as her husband held it. While his wife was on the ladder, Calhoun kicked it, causing her to fall to the ground. Appellant did not call 911 or otherwise attempt to summon help. In addition, although he had been trained in CPR, he did not attempt to help his wife. Instead, he washed, changed his clothes, and then drove to a hardware store to purchase joint compound. He then went to pick up Laura at her school, where he met with a teacher. An hour later, he picked up Kevin at his school. Thereafter, he drove his children home. After arriving at the house, he maneuvered his children away from the side of the house where their mother's body was lying. That evening, he took both his children to a softball game in which Laura participated.

At approximately 9 p.m. that evening, Laura called her aunt and uncle, Javier and Milagros Santiago. Mr. Santiago was Gladys Calhoun's brother. Laura was trying to find her mother and asked the Santiagos whether they knew where she was. Ms. Santiago responded that she did not know. At 10 p.m., Ms. Santiago called appellant and asked whether Ms. Calhoun was in the house. Calhoun responded that she was not. He also stated that her car was not at the house, but that her pocketbook was in the kitchen. Worried, the Santia-

---

1. In large measure, we shall summarize the facts in the light most favorable to appellee, the prevailing party.

gos decided to drive to the Calhoun residence, along with their sons, Yiloiz and Nell.

At 10:25 p.m., Calhoun called 911 and reported his wife missing. At approximately 10:30 p.m., he called Jennifer Calhoun Rydings, a daughter from a prior marriage, and told her he could not find his wife. He asked Rydings to come to the house, which Rydings agreed to do.

When the Santiagos arrived at the house at approximately 10:40 p.m., Mr. Santiago began asking questions about his sister's whereabouts. After seeing her keys, wallet, and driver's license in the kitchen, Mr. Santiago asked how her car could be gone. Calhoun responded that the car was "in the shop." Mr. Santiago asked for a flashlight in order to begin a search. He told Yiloiz, his sixteen-year-old son, to look in the living room and on the porch. When Yiloiz went to the porch, he saw his aunt's body on the ground.

Yiloiz immediately ran to the kitchen and alerted his mother, and then raced to the garage where his father and appellant were standing. Everyone went to the place where Ms. Calhoun's body was lying. Mr. Santiago touched Ms. Calhoun's legs and found them cold. After he checked for a pulse and found none, he directed his wife to call 911.

Rydings arrived at the house and encountered Yiloiz as he was running down the driveway to meet the ambulance. Yiloiz told her that something was "wrong" with Gladys. Still unsure of what was happening, Rydings drove to the house and ran through the front door. Ms. Santiago then led her to Ms. Calhoun's body. Rydings felt Ms. Calhoun's neck for a pulse and could not find any. She also found her body to be "very, very stiff." Later, Rydings saw her father begin to cry and fall to the ground. Rydings testified at trial that, at that point, "I got very angry because immediately I just knew he had something to do with this. I mean, I don't know how, I just knew and I was very angry, very angry."

Rydings telephoned her sister, Jacqueline Calhoun, another daughter from appellant's prior marriage, and told her what

had happened. Jacqueline drove to her father's house and remained there until approximately 4 a.m.

Medical personnel arrived at the scene and pronounced Ms. Calhoun dead. Howard County police were dispatched to the house at 10:54 p.m. Officer T.R. Read examined Ms. Calhoun's body and observed a significant skull fracture and a large amount of dried blood on Ms. Calhoun's head and arms. He also saw two large dried blood stains on a blue plastic tarpaulin that was covering a stack of scaffolding behind Ms. Calhoun's body. In addition, he noted a small area of blood spatter on the tarpaulin, consistent with an impact area where Ms. Calhoun's head would have hit the tarpaulin.

Homicide detective Frank Dayhoff arrived at 11:39 p.m. and took charge of the investigation. At 12:30 a.m., Detective Dayhoff conducted the first of a series of interviews with appellant. Calhoun initially indicated that he did not know how his wife had died. He said that he had left his house between 1:30 and 2:00 p.m. to purchase joint compound, then went to pick up his children at school, returned home at approximately 4:30 p.m., and then took his children to dinner and a softball game. He acknowledged that Gladys had suspected him of having an affair with a co-worker, but added that this was not true and Gladys's suspicions were "nonsense." He also stated that he and his wife had had a good relationship and had been rebuilding their marriage since March 1992. On May 21, 1992, eight days after his wife's death, Detective Dayhoff again interviewed appellant. Calhoun provided an account that was consistent with the one that he had first given.

On the night of June 6, 1992, Detective Dayhoff interviewed appellant for a third time. He was accompanied by Lieutenant Sam Bowerman. The detective confronted Calhoun with a note that one of his wife's co-workers had written. The co-worker stated that, about two weeks before her death, Ms. Calhoun had said, "If I die suddenly, it won't be an accident. You don't know what he is capable of doing." After reading the note, Calhoun became visibly shaken and pale. He then

stated: "I kicked the ladder and she fell. It was all over a simple thing."

Appellant also provided Detective Dayhoff with the following information. He stated that he and Gladys were talking as she climbed the ladder; the conversation grew heated. According to the detective's testimony at trial, appellant related that his wife made a caustic remark "about something that had happened between them, something he had tried to do in Lancaster, PA a few weeks before." As this remark "challenged his manhood," appellant became angry at her because "she was right." Calhoun then kicked the ladder.

An autopsy was performed on Ms. Calhoun by Dr. Dennis Chute, an assistant medical examiner. Dr. Chute concluded that Ms. Calhoun had died from head injuries sustained in a fall from a ladder. He classified the death as a homicide.

In July 1992, appellant was arrested and charged with second degree murder, voluntary manslaughter, and reckless endangerment. On March 11, 1993, pursuant to a plea agreement, appellant pleaded guilty to voluntary manslaughter, pursuant to an agreed Statement of Facts. On June 24, 1993, he was sentenced to five years imprisonment. When the civil trial began on March 13, 1995, appellant was incarcerated at the State correctional facility in Roxbury.

At the civil trial, Rydings testified that her father had informed her of his intention to get a divorce. She also knew her father had contacted a lawyer in order to attempt to arrange an amicable divorce settlement. The reason for this, according to Rydings, was that Calhoun believed that his previous divorce had cost him much financially, for which he was "extremely angry." Rydings testified:

> He didn't want to loose [sic] his money. It really bothered him that he was going to have to [lose] his money because he knew that in a divorce she would get the kids, the house, the whole thing and he didn't want to go through that again after he had gone through it with my mother.

Rydings also stated that, according to her father, the lawyer said: "[Y]ou don't need a lawyer, you need a hit man."

Jacqueline Calhoun also testified that her father had spoken to her about a divorce. She stated that the financial circumstances of his previous marriage were "always a sore subject" between her mother and father. She added: "Dad would always say Mom got everything." Additionally, she testified that her father had "a very, very high temper," a characteristic that she and her sister regarded as "almost comical." Additionally, she said that after leaving her father's house in the early morning hours of May 14, 1992, she proceeded directly to the police station, because she felt the death was not accidental.[2]

Detective Dayhoff testified that Ms. Calhoun's injuries were inconsistent with a fall from a ladder. He particularly relied on the fact that Ms. Calhoun had two head wounds. He stated: "It is inconceivable that a person could fall and even if they fell directly on the top of their head, could receive two large gaping wounds that fractured the skull in these places from the fall." Autopsy photographs substantiated that Ms. Calhoun had two head wounds.

In addition, Detective Dayhoff testified that Ms. Calhoun's body lacked "ancillary injuries" that would be consistent with a fall from a ladder. These injuries would include compression fractures and contusions or fractures in her shoulders, elbows, hips, or knees. He reasoned that, when a body falls, it strikes the ground in a number of different places. In Detec-

---

**2.** The following colloquy occurred at trial:

[APPELLEE'S COUNSEL]: Now why did you go to the police station?

MS. CALHOUN: Because I knew that something was wrong. I knew that—I had a gut feeling that everything was not right and that it wasn't an accident.

[APPELLEE'S COUNSEL]: What did you base that feeling on at that particular time?

MS. CALHOUN: There's nothing in particular. I guess its [sic] just a lifetime of knowing your father. I knew that he didn't have a particular loving relationship with her. I knew that he had spoken about a divorce. He had talked about a divorce with me. And I also knew that he was not going to get a divorce because she, as a result of him having an affair, she would have been entitled to most everything and he would not have allowed that to happen.

tive Dayhoff's view, Ms. Calhoun "slid" down the ladder, sustaining contusions on her lip and nose when they hit the rungs, and landed in a sitting position. Then, Ms. Calhoun was struck in the head with great force by a blunt object. The force caused her head to strike the tarpaulin, resulting in the blood stains.

Dr. Chute testified, however, that Ms. Calhoun's injuries were consistent with a fall from a ladder, although he conceded that it was "possible" that the two head wounds could have been caused by blows from an object, such as a two-by-four. He further stated that it was possible that her injuries were caused by an event other than a fall from a ladder or a blow to the head, "because the wounds are not specific of a particular object which the skull or the scalp came in contact with."

Both Laura and Kevin testified briefly at trial. They each stated that they had loved their mother and that they missed her. In addition, both children have received counseling while residing with Susan and Robert Hereth, who are apparently friends of appellant. Their counselor, Dr. David C. Williams, also testified at trial. He stated that Laura was fearful of her father, did not trust him, and did not wish to live with him after he was released from prison. Dr. Williams also testified that Kevin was still unable to discuss at length what the loss truly meant to him. Kevin was, however, aware that his father had pleaded guilty to the charges related to his mother's death.

In his testimony, Calhoun insisted that the incident was an accident, and that he did not intend to kill his wife. Calhoun gave virtually the same account of the occurrence that he had given to the police in his third interview, but with one variation. He stated that he kicked the ladder because he was angry at *himself,* not Gladys. He explained that the subject of Lancaster, Pennsylvania referred to a shopping trip with his wife to make amends for his extramarital affair. When his wife mentioned Lancaster, appellant became angry and disappointed in himself for what he had done "behind my wife's

back." It was then that he kicked the ladder. The next thing he knew, his wife was lying face down on the ground next to him. Calhoun testified that he realized that she was not breathing and then ran to call 911. Once inside the house, however, he decided that he needed to "get her breathing" again. He walked outside, tried unsuccessfully to turn his wife over, and then "panicked" and left. Appellant further stated that he wanted to preserve his marriage with Gladys; he ended his affair with the co-worker, adding that it was inexcusable but it was not "a long term relationship." Calhoun also admitted that he had lied to the police during his initial interviews.

Further, Calhoun testified that, after their mother's death, Laura and Kevin lived with him. Appellant said that, as appellant's sentencing approached, he made arrangements for the children's care. On March 30, 1993, he signed an agreement giving temporary legal custody of his children to Robert and Susan Hereth, in the event that appellant were sent to prison. The arrangement is to terminate upon appellant's request for the return of his children upon his release from prison. The Hereths subsequently filed in the circuit court a "Complaint for Temporary Custody and Other Relief," in which Calhoun joined, seeking an order awarding them temporary legal custody of Laura and Kevin "from June 24, 1993 to so long as the said minors should reside with them." On April 6, 1993, the court signed such an order. In addition, Calhoun joined the Hereths in opposing a later petition filed by the Santiagos, seeking appointment as guardians of the children. On September 24, 1993, the court signed another order naming the Hereths as guardians of the person for Laura and Kevin and naming appellee as guardian of their property. With respect to the custody issue, appellant offered in evidence various pleadings and other documents, some of which referred to the fact that appellant had pleaded guilty to voluntary manslaughter in connection with the death of his wife.

The parties stipulated at trial that appellant wants to be reunited with his children upon his release from custody.

Appellant conceded, however, that he has not paid any formal child support to appellee, although he has continued to pay the taxes, mortgage payments, and insurance on the home that he had owned with his wife.

At the close of appellee's evidence, Calhoun made a motion for judgment on the basis of parent-child immunity. The trial court denied the motion, stating that "the Court is of the opinion that the parent/child immunity does not apply in this case." At the close of all the evidence, appellant made another motion for judgment on the same ground. In response, appellee contended that the case fits within the exception announced in *Mahnke v. Moore.* The court agreed with appellee and again denied the motion.[3]

The case was then submitted to the jury. The verdict sheet contained three questions. First, the jury was asked: "With respect to Plaintiffs' claims that the Defendant, John C. Calhoun[,] committed a wrongful act or acts which caused the death of Gladys E. Calhoun, how do you find?" Second, the jury was asked: "With respect to Plaintiffs' claims that the wrongful act or acts of the Defendant, John C. Calhoun[,] were atrocious, show a complete abandonment of the parental relation, were intentional, were willful and were malicious, how do you find?" Third, the jury was asked, if it found for the plaintiffs on Question 1 or both Questions 1 or 2, what damages it found that the plaintiffs had suffered "as a result of the wrongful act or acts of the Defendant."

Appellant's counsel objected to the second question, claiming it was "only necessary for punitive damages." The court overruled the objection, stating, "My interpretation is, it

---

**3.** Nevertheless, the court declined to submit appellee's punitive damages claim to the jury. Relying on our decision in *Cohen v. Rubin,* 55 Md.App. 83, 99–101, 460 A.2d 1046 (1983), the court re-affirmed a pretrial determination that punitive damages are not recoverable in a wrongful death action. In *Cohen,* we stated: "We are of the opinion . . . that punitive damages are not recoverable in cases arising under the wrongful death statute unless and until the legislature so provides." *Id.,* 55 Md.App. at 101, 460 A.2d 1046. *See also Baltimore & Ohio Railroad v. State, Use of Kelly,* 24 Md. 271, 280 (1866). This ruling has not been challenged on appeal.

should be in there according to the statute in [*Mahnke*]."
Thereafter, the jury found in favor of appellee with respect to
the first question. As to the second question, the jury fore-
man stated that the jury "could not come to a verdict." It
then awarded the children a total of $2,360,000 in damages.[4]

Appellee's counsel requested resubmission of the second
question, in the form of five separate questions. He argued
that the jury "obviously can't agree on all of them" and
"[p]erhaps they can agree one way or the other on each one of
those five items." Calhoun's counsel objected, saying:

> Your Honor, I object to that recommendation. As I
> understand the wrongful death act, ah ... as far as proof.
> When you look at the statute, and I'll have to pull that a
> little bit ... the statute says the criteria for proof is,
> number one, determine if there is a wrongful act. And the
> statute defines a wrongful act. The statute defines a
> wrongful act not in terms of what the definition of ... item
> two does. That's why I objected to it to begin with.

> \* \* \* \* \* \*

> [O]nce you find the wrongful act, ... as I understand the
> cases, you go into the damages. The jury has ... found the
> wrongful act, and that's all they [are] required to do. In my
> opinion, and I think I have some law to back that up, I have
> to dig it up, because I was going over last night.... [O]nce
> they've found a wrongful act, that ends that part of the
> burden of proof ah ... of their ... of their obligation as a
> jury, ... to do anymore. And then they go into the
> damages. I ... I think the jury has done its job. I ...
> they don't have to do anymore.

---

4. This sum consisted of $70,000 to Laura and $90,000 to Kevin for
"pecuniary/economic damages" until their eighteenth birthdays;
$1,000,000 to each child for "mental anguish, emotional pain and
suffering, loss of society, companionship, comfort, protection, parental
care, attention, advice, counsel, training or guidance"; and $100,000 to
each child for costs of education that they could reasonably expect
would have been paid by their mother.

The trial judge agreed with appellant and declined to resubmit the second question. The following exchange occurred:

THE COURT: That's my understanding too, Mr. Peklo [appellee's counsel], that once they decide number one, they don't necessarily have to go into number two to come up with number three. Because the way the statute reads, wrongful act, and they have determined it was a wrongful act. So, okay.

[APPELLEE'S COUNSEL]: I understand your position, Your Honor. We respectfully disagree.

THE COURT: You respectfully disagree. But, I don't . . . why do they have to go to number two.

[APPELLEE'S COUNSEL]: Well, that's just our position, Your Honor, I mean.

THE COURT: No, I say what's your reasoning behind going to number two. Once they make a decision that there was a wrongful act, you're saying they can't go into damages until they decide one or the other.

[APPELLEE'S COUNSEL]: Oh no. They can, they can. It was suggested that, that be put into help for any ah . . . well, I'll withdraw that.

THE COURT: Okay. Mr. Bailiff you can let them go. They're free to go.

Thereafter, the court entered final judgment in favor of appellee.

## *DISCUSSION*

### I.

We begin with a review of the doctrine of parent-child immunity. In English common law, there was no rule preventing suits between parents and their children. *See* W. Page Keeton et al., PROSSER AND KEETON ON THE LAW OF TORTS 904 (5th ed.1984). The doctrine of parent-child immunity first appeared in an 1891 decision by the Mississippi Supreme Court, *Hewellette v. George,* 68 Miss. 703, 9 So. 885 (1891), *overruled in part in Glaskox v. Glaskox,* 614 So.2d 906

(Miss.1992).[5] There, the court refused to permit a suit by a minor against her mother (and then her mother's executor) in which she alleged that her mother had wrongfully committed her to an insane asylum. The court said, at 9 So. at 887:

> [S]o long as the parent is under obligation to care for, guide, and control, and the child is under reciprocal obligation to aid and comfort and obey, no such action as this can be maintained. The peace of society, and of the families composing society, and a sound public policy, designed to subserve the repose of families and the best interests of society, forbid to the minor child a right to appear in court in the assertion of a claim to civil redress for personal injuries suffered at the hands of the parent. The state, through its criminal laws, will give the minor child protection from parental violence and wrong-doing, and this is all the child can be heard to demand.

Although the court cited no authority to support its broad pronouncement, its holding rapidly spread to many other jurisdictions. *See, e.g., McKelvey v. McKelvey,* 111 Tenn. 388, 77 S.W. 664 (1903) (child could not recover for severe injuries inflicted by cruel and inhuman treatment on the part of her father and stepmother), *overruled in Broadwell v. Holmes,* 871 S.W.2d 471 (Tenn.1994) (parent-child immunity limited to conduct involving the exercise of parental supervision or the provision of parental care and custody); *Roller v. Roller,* 37 Wash. 242, 79 P. 788 (1905) (fifteen-year-old raped by her father could not maintain action), *overruled in part in Borst v. Borst,* 41 Wash.2d 642, 251 P.2d 149 (1952); *Miller v. Pelzer,* 159 Minn. 375, 199 N.W. 97 (1924) (action for deceit not permitted); *Smith v. Smith,* 81 Ind.App. 566, 142 N.E. 128 (1924) (action during majority for assault committed during minority not permitted), *disapproved in Barnes v. Barnes,* 603 N.E.2d 1337 (Ind.1992); *Matarese v. Matarese,* 47 R.I. 131,

---

**5.** Interestingly, in almost all of the authorities, the appellant's name in the Mississippi case is spelled "Hewlett." In the Southern Reporter, however, her name is spelled "Hewellette." Hereinafter, for ease of reference, we shall use "Hewlett."

131 A. 198 (1925) (no recovery for child's injuries resulting from parent's negligent operation of automobile), *overruled in Silva v. Silva,* 446 A.2d 1013 (R.I.1982); *Mesite v. Kirchenstein,* 109 Conn. 77, 145 A. 753 (1929).

In 1930, the Court of Appeals joined these jurisdictions in its decision in *Schneider v. Schneider, supra,* 160 Md. at 19, 152 A. 498. There, the Court reversed a judgment in favor of a mother against her unemancipated son for injuries that resulted from the son's negligent operation of the family automobile. Relying on *Hewlett* and other cases, the Court stated: "It appears that a majority of courts in which the question has arisen have decided that a minor child cannot maintain such an action against its parent." *Schneider,* 160 Md. at 22, 152 A. 498. The Court noted the potential conflict of interest that would arise if the parent were placed in the position of being the guardian of the child and simultaneously the child's adversary. *Id.,* 160 Md. at 22–23, 152 A. 498. But the Court also emphasized the public policy concerns articulated in *Hewlett:*

> Maintenance of the suit is inconsistent with the parent's status or office, and the dependence of the minor upon her, and also with the dependence of the law upon her for the fulfillment of necessary legal and social functions.
>
> * * * * * *
>
> We need not dwell upon the importance of maintaining the family relation free for other reasons from the antagonisms which such suits imply. "Both natural and politic law, morality, and the precepts of revealed religion alike demand the preservation of this relation in its full strength and purity." *Schouler, Domestic Relations,* sec. 223.

*Id.,* 160 Md. at 23–24, 152 A. 498.

In *Yost v. Yost,* 172 Md. 128, 190 A. 753 (1937), the Court reaffirmed *Schneider,* and refused to permit a suit in equity by a minor child against his father for support or an increase in the amount of maintenance. It held: "[F]or acts of passive negligence incident to the parental relation, there is no liability." *Id.,* 172 Md. at 134, 190 A. 753. It also reiterated the

public policy rationale that supported the doctrine, saying: "The doctrine is founded upon public policy, and is designed to preserve the peace and harmony of the home, as well as to recognize the authority of the parent, under normal conditions, responsible for the maintenance of the home." *Id.*

As the decades have passed the doctrine of parent-child immunity has become increasingly unpopular. Beginning in the early 1960's, courts steadily began to repudiate it. *See, e.g., Rousey v. Rousey,* 528 A.2d 416 (D.C.1987) (declining, over a strong dissent, to adopt the doctrine in the District of Columbia); *Gibson v. Gibson,* 3 Cal.3d 914, 92 Cal.Rptr. 288, 479 P.2d 648 (1971); *Goller v. White,* 20 Wis.2d 402, 122 N.W.2d 193 (1963) (seminal case abrogating the doctrine except in cases when the parent's tort involves "an exercise of parental authority" or "ordinary parental discretion with respect to the provision of food, clothing, housing, medical and dental services, and other care"). Commentators and treatise writers have also generally denounced the doctrine. *See* Richard J. Gilbert & Paul T. Gilbert, MARYLAND TORT LAW HANDBOOK § 23.4 at 262 (2nd ed. 1992) ("The time has come for Maryland to jettison *Hewlett* and the Maryland decisions that *Hewlett* sired."); Comment, *Parent–Child Tort Immunity: Time for Maryland to Abrogate an Anachronism,* 11 U. Balt. L.Rev. 435 (1982); PROSSER AND KEETON ON TORTS, *supra,* § 122 at 907 (calling the abrogation movement a "long-overdue landslide"); Comment, *Parent–Child Immunity: The Case for Abolition,* 6 San Diego L.Rev. 286, 295–96 (1969); McCurdy, *Torts Between Parent and Child,* 5 Vill. L.Rev. 521, 529 (1960); McCurdy, *Torts Between Persons in Domestic Relations,* 43 Harv. L.Rev. 1030, 1079–80 (1930). Similarly, Section 895G of the RESTATEMENT (SECOND) OF TORTS (1977) recommends the doctrine's abrogation.[6]

---

6. Section 895G states:
 (1) A parent of child is not immune from tort liability to the other solely by reason of that relationship.
 (2) Repudiation of general tort immunity does not establish liability for an act or omission that, because of the parent-child relationship, is otherwise privileged or is not tortious.

Some courts have questioned the doctrine's common law roots. *See, e.g., Rupert v. Stienne,* 90 Nev. 397, 528 P.2d 1013, 1018 (1974). Another criticism views the rule as a misguided anachronism that is more likely to *increase,* rather than decrease, familial hostility, because of an uncompensated loss resulting from the wrong committed by the family member. These critics point out that the family harmony that the rule seeks to preserve is most likely damaged by the tort itself, and that a state-created wall of immunity around the wrong-doer hardly tends to promote peace and good feelings. *See Silva v. Silva,* 446 A.2d 1013, 1015 (R.I.1982); *Falco v. Pados,* 444 Pa. 372, 282 A.2d 351, 355 (1971).

Some of the strongest criticism of the rule appears in cases involving motor torts, in which the loss will almost always be paid by an insurance company, rather than the defendant-family member. These critics assert that, at least in cases covered by insurance, the risk of family friction is substantially reduced by the fact that the wrongdoer will not have to pay the judgment out of his or her own pocket. *See Montz v. Mendaloff,* 40 Md.App. 220, 227–228, 388 A.2d 568 (1978) (concurring opinion). In this circumstance, the parent-child immunity doctrine does little to improve family harmony, but does much to create a windfall for the negligent party's insurance carrier. *See Heyman v. Gordon,* 40 N.J. 52, 190 A.2d 670, 672 (1963) (Jacobs, J., dissenting). These considerations have led a large number of courts to carve out an exception to parent-child immunity in motor tort cases. *See, e.g., Glaskox v. Glaskox,* 614 So.2d 906 (Miss.1992) (overruling *Hewlett* in part, and allowing suits between parents and children in cases arising out of the negligent operation of an automobile); *Sorensen v. Sorensen,* 369 Mass. 350, 339 N.E.2d 907 (1975). *See generally Warren v. Warren, supra,* 336 Md. at 627 n. 2, 650 A.2d 252 (collecting cases).

Nevertheless, there are considerations that support the retention of parent-child immunity. These considerations have led both this Court and the Court of Appeals to decline to join the great wave of opposition to the doctrine. Indeed, in *Warren v. Warren,* the Court observed that Maryland is

one of only eight states that retains the doctrine in its broadest form. *Id.*, 336 Md. at 621 n. 1, 650 A.2d 252. Among the considerations in favor of the doctrine are concern for *stare decisis* and recognition of the fact that, to this day, the General Assembly has not abolished or limited the immunity, notwithstanding the decades that have elapsed since its adoption. As a result, in 1972, we concluded that the immunity was still part of the law of Maryland. *See Latz v. Latz*, 10 Md.App. 720, 272 A.2d 435, *cert. denied*, 261 Md. 726 (1971). *See also Montz v. Mendaloff, supra*, 40 Md.App. at 224, 388 A.2d 568.

There are also public policy considerations to which we alluded earlier. Parent-child immunity rests on the need to preserve parental authority and to prevent the corrosive effects of litigation on family harmony. In *Frye v. Frye*, 305 Md. 542, 505 A.2d 826 (1986), after extensively discussing the doctrine, the Court decided not to abolish it. The Court said, at 305 Md. at 548, 505 A.2d 826:

A common theme appears in the rationale advanced by the courts which championed the parent-child immunity. The rule is founded upon the relation in which the parent and the unemancipated minor child stand to each other. The reciprocal dependence and entitlement of that relationship promotes a public policy which the rule reflects.

The Court later stated:

It is clear that for over half a century this Court has recorded its belief in the importance of keeping the family relationship free and unfettered. *Our primary concern with regard to matters involving the parent-child relationship was the protection of family integrity and harmony and the protection of parental discretion in the discipline and care of the child.* We have steadfastly recognized the authority of parents and their need to fulfill the functions devolved upon them by that position. *The parental status should be held inviolate* so that there be no undue interference with the dependence of the minor unemancipated child on the parents for such judgment and care needed during

the child's minority or with the dependence of the law on the parent for fulfillment of the necessary legal and social functions associated with the office of parent. This Court has declared it to be the public policy that discipline in the family not be impaired and that tranquility of the home be preserved. Matters which tend to disrupt or destroy the peace and harmony of the home are not to be condoned.

*Id.,* 305 Md. at 551–52, 505 A.2d 826 (emphasis supplied). The Court added: "It is equally clear that this Court has had an abiding belief that the parent-child immunity rule enhances the public policy in that it subserves the repose of families and the best interests of society by preserving the peace and harmony of society and of the families composing society." *Id.* at 552, 505 A.2d 826.

Accordingly, the Court concluded that the doctrine is "essential to the maintenance of discipline and to the stability of family harmony." *Id.,* 305 Md. at 561, 505 A.2d 826. Further, the Court declined to create an exception for motor tort cases, notwithstanding the presence of compulsory automobile insurance. It reasoned that such a decision involved important policy issues that are best decided by the Legislature. *Id.,* 305 Md. at 562–67, 505 A.2d 826.

In 1994, in *Warren v. Warren, supra,* 336 Md. 618, 650 A.2d 252, the Court reaffirmed the *Frye* decision. *Id.,* 336 Md. at 622–26, 650 A.2d 252. Writing for the Court, Judge Karwacki said, at 336 Md. at 626, 650 A.2d 252:

[W]e believe that it is still in the best interest of both children and parents to retain parent-child immunity. Abrogating the immunity would result only in further discord within the family and would interfere with the exercise of parental discretion in raising and disciplining children. We are not willing to open the door to rebellious children and frustrated parents and allow the courts to become the arbitrator of parent-child disputes and overseer of parental decisions.

This array of cases makes clear that the doctrine of parent-child immunity remains deeply embedded in the law of

Maryland; it is up to the General Assembly to decide whether it is time to change the law. With this background in mind, we turn to the issues presented.

## II.

Appellee contends that parent-child immunity does not apply here, because the children's wrongful death action against their father "derives from" the cause of action that their mother would have had against appellant had she survived. The parties have not cited, nor have we discovered, any reported Maryland decision that has decided the precise issue of whether, since the abrogation of interspousal immunity, a minor child may maintain a wrongful death action against one parent for the death of the other parent, if the decedent would have had a viable claim against the surviving spouse, had the decedent lived.

Appellee relies on the language of the Wrongful Death Act, Maryland Code (1974, 1995 Repl.Vol.), §§ 3–901 *et seq.* of the Courts and Judicial Proceedings Article ("C.J."). C.J. § 3–902(a) provides: "An action may be maintained against a person whose wrongful act causes the death of another." C.J. § 3–901(e), in turn, defines "wrongful act" as "an act, neglect, or default including a felonious act which *would have entitled the party injured to maintain an action and recover damages if death had not ensued.*" (Emphasis supplied.) C.J. § 3–904(a) provides: "An action under this subtitle shall be for the benefit of the wife, husband, parent, and child of the deceased person."

Appellee asserts that, because Ms. Calhoun, had she survived, would have been able to maintain her own action against appellant, due to the abrogation of interspousal immunity, *see Boblitz v. Boblitz,* 296 Md. 242, 462 A.2d 506 (1983), her children, based on C.J. §§ 3–901(e), 3–902(a) and 3–904(a), may pursue their own action against him. We disagree with appellee's contention.

It is true that a wrongful death action is, in some sense, a "derivative" action. This is because the survivors

may not maintain a wrongful death action if the decedent would not have been able to recover against the tortfeasor had the decedent lived. *See Smith v. Gross,* 319 Md. 138, 144, 571 A.2d 1219 (1990); C.J. § 3–901(e). Thus, there exists the general rule that defenses that would have been good against the decedent, had the decedent survived, are also good against the survivors in a wrongful death action. *See Smith v. Gross, supra* (parent-child immunity); *Frazee v. Baltimore Gas & Electric Co.,* 255 Md. 627, 258 A.2d 425 (1969) (contributory negligence); *Baltimore & Potomac Railroad v. State, Use of Abbott,* 75 Md. 152, 23 A. 310 (1892) (assumption of the risk).

Nevertheless, it is also well settled that a wrongful death action is not purely a "derivative" action; the survivors are not suing as a representative of the decedent. Instead, a wrongful death action is primarily a *personal* claim asserted by the survivors for their *own* loss resulting from the decedent's death. This principle was enunciated in *Globe American Casualty Co. v. Chung,* 76 Md.App. 524, 547 A.2d 654 (1988), *vacated and appeal dismissed on other grounds,* 322 Md. 713, 589 A.2d 956 (1991), in which we discussed the difference between a wrongful death action and a "survival action":

When a victim dies because of the tortious conduct of someone else, two entirely different types of claim may arise. One is a survival action commenced or continued by the personal representative of the deceased victim, seeking recovery for the injuries suffered by the victim and prosecuted just as if the victim were still alive. It is called a "survival action" in the sense that the claim has survived the death of the claimant. The other is a **wrongful death action, brought by the relatives of the victim and seeking recovery for their loss by virtue of the victim's death.** A deceptive similarity inevitably results from the prominent common denominator fact that the victim has died. In other essential characteristics, however, the **two types of claim are clearly distinct.** The first arises from the tortious infliction of injury upon the victim; the second, only from the actual death of the victim. **In the first, damages are measured in terms of** *harm to the victim;* **in the**

**second, damages are measured in terms of** *harm to others* **from the loss of the victim.** In the first, the personal representative serves as the posthumous agent of the victim; **in the second, his surviving relatives do not serve as his agent at all. They act in their own behalf.**

*Id.,* 76 Md.App. at 526–27, 547 A.2d 654 (italics in original; boldface added).[7]

█ Thus, even though a plaintiff in a wrongful death action depends, in part, on the rights that the decedent would have had, the wrongful death action is a personal suit against the defendant to recover for the claimant's own injuries. The defendant may therefore raise certain defenses against the plaintiff regardless of whether the defendant could have raised the defenses against the decedent. For example, a plaintiff in a wrongful death action may not recover if he or she was contributorily negligent. *See Baltimore & Ohio Railroad v. State, Use of Fryer,* 30 Md. 47, 52–53 (1869); *State, use of Coughlan v. Baltimore & Ohio Railroad,* 24 Md. 84, 104–05 (1866). Here minor children have sued their father. Therefore, the doctrine of parent-child immunity must be considered.

Cases from other jurisdictions, decided at a time when those jurisdictions recognized parent-child immunity in the way that Maryland does, have reached the same result. In *Heyman v. Gordon,* 40 N.J. 52, 190 A.2d 670 (1963), which was overruled in part on other grounds in both *Immer v. Risko,* 56 N.J. 482, 267 A.2d 481 (1970) (abrogating interspousal immunity in cases arising from the negligent operation of an automobile)

---

7. Survival actions are governed by C.J. § 6–401 and § 7–401(x) of the Estates and Trusts Article (1974, 1991 Repl.Vol., 1995 Supp.) ("E.T."). C.J. § 6–401(a) provides: "Except as provided in subsection (b) of this section [governing actions for slander], a cause of action at law, whether real, personal, or mixed, survives the death of either party." E.T. § 7–401(x) provides that, with certain exceptions, the personal representative of a decedent's estate "may prosecute ... actions, claims, or proceedings in any appropriate jurisdiction for the protection or benefit of the estate, including the commencement of a personal action which the decedent might have commenced or prosecuted." No survival action is involved in this case.

and *France v. A.P.A. Transport Corp.*, 56 N.J. 500, 267 A.2d 490 (1970) (abrogating parent-child immunity in such cases), a divided New Jersey Supreme Court held that a minor child could not bring a wrongful death action against his father for negligently causing the death of his mother in an automobile accident, although interspousal immunity would not bar the decedent's action. It concluded that the father was protected by parent-child immunity. The Court stated in *Heyman*, at 190 A.2d at 671:

Stripping the situation of formalities, which should not be allowed to disguise it, the real and only party in interest is the son. He seeks to collect money from his father on the ground that the latter negligently caused the death of his mother. We see no essential difference between this state of fact and that where an unemancipated child sues his parent for his own injuries, negligently caused.

Similarly, in *Durham v. Durham*, 227 Miss. 76, 85 So.2d 807 (1956), the Mississippi Supreme Court refused to permit a wrongful death action by a minor against her father for the death of her mother, based on the father's negligent operation of an automobile. Citing *Hewlett v. George*, the court said, at 85 So.2d at 809:

This State is committed to a policy that actions may not be maintained by an unemancipated minor against a parent for a tort. We are not persuaded that the policy reasons involved apply with less force to a case arising under the wrongful death statute insofar as the question is here presented.

The court indicated that the State's wrongful death statute modified the common law. In order to remove a wrongful death action from the scope of parent-child immunity, it said that there must be a specific provision in the law repealing the immunity. The court reasoned that parent-child immunity was a common law rule (notwithstanding its absence from the English decisions), and statutes in derogation of the common law are strictly construed. Thus, concluded the court, the wrongful death statute imported all common law immunities

that were not specifically abolished. As there was no specific repeal of parent-child immunity in the statute, the court determined that the immunity still applied, stating, at 85 So.2d at 809:

> The wrongful death statute should be construed and administered consistent with all the rules of common law not expressly abrogated. [Citation] We fail to find in the wrongful death statute any expression indicating a legislative intent to abrogate the rule that a minor may not sue a parent in tort.

Reaching the same result is *Strong v. Strong,* 70 Nev. 290, 267 P.2d 240 (1954), *overruled in part in Rupert v. Stienne,* 90 Nev. 397, 528 P.2d 1013 (1974) (abrogating parent-child immunity). There, the Nevada Supreme Court barred an action by a child's guardian ad litem against the child's mother for the wrongful death of the child's father. Like *Durham,* the court reasoned that statutes in derogation of the common law are construed narrowly. Therefore, the general language of the wrongful death statute authorizing children to bring suit did not repeal the "common law" doctrine of parent-child immunity. *Id.,* 267 P.2d at 242.[8]

Maryland, like Mississippi and Nevada, follows the doctrine that statutes in derogation of the common law are strictly construed. *See Department of Public Safety and Correctional Services v. ARA Health Services,* 107 Md.App. 445, 457, 668 A.2d 960 (1995), *cert. granted,* 341 Md. 522, 671

---

8. Today, neither *Durham, Strong,* nor *Heyman* would be applicable in the jurisdictions that decided them. The Mississippi Supreme Court, as we have observed, abolished parent-child immunity for motor torts in *Glaskox v. Glaskox,* 614 So.2d 906 (Miss.1992). In *France v. A.P.A. Transport Corp.,* 56 N.J. 500, 267 A.2d 490 (1970), the New Jersey Supreme Court did the same. New Jersey has also abolished parent-child immunity in cases in which the "exercise of parental authority and the adequacy of child care are ... not at issue." *See Small v. Rockfeld,* 66 N.J. 231, 330 A.2d 335, 341–44 (1974) (father allegedly deliberately or recklessly killed mother). In 1974, the Nevada Supreme Court criticized *Strong*'s "false premise" that parent-child immunity was a common law rule, and abrogated the doctrine entirely. *Rupert v. Stienne,* 90 Nev. 397, 528 P.2d 1013, 1018 (1974).

A.2d 500 (1996). The common law did not recognize wrongful death actions. *See Stewart v. United Electric Light and Power Co.,* 104 Md. 332, 333, 65 A. 49 (1906). Therefore, our Wrongful Death Act is in derogation of the common law, and is narrowly construed. *See Flores v. King,* 13 Md.App. 270, 274, 282 A.2d 521 (1971). Notwithstanding the analysis in *Durham* and *Strong,* the doctrine of parent-child immunity, as we have observed, is not a "common law" doctrine. Instead, it was created by the Mississippi Supreme Court in 1891 and adopted in Maryland in 1930 by the Court of Appeals. Maryland's original Wrongful Death Act was enacted in 1852, *see* Act of 1852, ch. 299, some seventy-eight years before the doctrine was adopted. Consequently, it could be argued that the Maryland Legislature could not have failed to repeal specifically the parent-child immunity doctrine when it enacted the Wrongful Death Act, because at that time there was no such doctrine to repeal.

In our view, however, the fact that parent-child immunity did not exist when the original statute was enacted in 1852 is of no moment. The statute is not fixed in concrete within the legal principles prevalent in 1852. Rather, the General Assembly established a cause of action and allowed its governing legal principles to evolve with the times. *Cf. Smith v. Wade,* 461 U.S. 30, 34 n. 2, 103 S.Ct. 1625, 1629 n. 2, 75 L.Ed.2d 632 (1983) (reaching a similar conclusion in the context of 42 U.S.C. § 1983, a federal civil rights statute enacted in 1871). As our decisional law has shown, the courts of this State have formulated a strong policy against suits between parents and their minor children. If, under the prevailing legal principles, the defendant's actions are immune from suit, then no action may be maintained.

Moreover, since 1852, the Wrongful Death Act has gone through multiple recodifications and revisions. While recodification of statutes is generally for the purpose of clarity, *see Rohrbaugh v. Estate of Stern,* 305 Md. 443, 449, 505 A.2d 113 (1986), some of the amendments have been substantive. For example, in 1962, the requirement that the action for the benefit of the beneficiaries be brought in the name of the

State was abolished. *See* 1962 Md. Laws, ch. 36, § 43.[9] The Legislature has certainly had ample opportunity to amend the wrongful death statute to remove the developing doctrine of parent-child immunity from its ambit. It has not done so. Given the current legal landscape, parent-child immunity is firmly entrenched in Maryland.

In any event, we need not base our decision on the principle that statutes in derogation of the common law are strictly construed. Rather, we conclude that the policies supporting parent-child immunity apply to wrongful death actions. Those policies include "preservation of family harmony[,] preservation of parental discipline and control, prevention of fraud and collusion, and the threat that litigation will deplete family resources." *Warren v. Warren,* 336 Md. at 625, 650 A.2d 252. A wrongful death action between a parent and a child would thwart these policies, even if the case is one in which the decedent could have maintained her own action against the tortfeasor had she lived. Therefore, pursuant to the longstanding policy of this State, we hold that, in a wrongful death action between a minor and a parent for the death of the other parent, the doctrine of parent-child immunity applies.[10]

---

**9.** The act originally authorized actions for the benefit of the wife, husband, parent, and child of the decedent, but the action would be brought in the name of the State for the use of those persons. *See* former Code, Art. 67, § 4; *Stewart v. United Electric Light & Power Co.,* 104 Md. 332, 338, 65 A. 49 (1906).

**10.** There are decisions from other jurisdictions that reach a different conclusion from ours. *See Cummings v. Locklear,* 12 N.C.App. 572, 183 S.E.2d 832, *cert. denied,* 279 N.C. 726, 184 S.E.2d 883 (1971); *Bonner v. Williams,* 370 F.2d 301 (5th Cir.1966) (applying Alabama law); *Fowler v. Fowler,* 242 S.C. 252, 130 S.E.2d 568 (1963); *Shumway v. Nelson,* 259 Minn. 319, 107 N.W.2d 531 (1961). Each of these cases was resolved under local wrongful death statutes in which the executor or administrator of the decedent could file the action for the benefit of the beneficiary. In Maryland, the survivors may bring their own direct action against the tortfeasor. *Cant v. Bartlett,* 292 Md. 611, 620 n. 1, 440 A.2d 388 (1982). This distinction may or may not make a difference in the rationale of those cases. But in any event, to the extent that

### III.

### A.

As we have noted, appellant claims that suit is barred by parent-child immunity. There is, however, a limitation on parent-child immunity that the Court of Appeals recognized in 1951 in *Mahnke v. Moore, supra,* 197 Md. 61, 77 A.2d 923.[11] There, the Court allowed a suit by a daughter against her father's estate for what the Court called "atrocious acts committed by her father." *Id.,* 197 Md. at 63, 77 A.2d 923. The declaration alleged that the parent had shot the child's mother in her presence, blowing away the right side of the mother's head. Then, the father kept his daughter with the dead body for six days. Thereafter, he drove the child to his home in New Jersey, where he committed suicide in her presence, by shooting himself with a shotgun. The shooting caused the father's blood to splatter on the daughter's face and clothing. *Id.,* 197 Md. at 63, 77 A.2d 923.

The Court held that the child had a right of action in tort for personal injuries resulting from the father's actions. After reviewing the development of the parent-child immunity doctrine, it recognized the general rule that suits between parents and minor children are not permitted. It said, at 197 Md. at 68, 77 A.2d 923:

> It is conceded, of course, that parental authority should be maintained. *It is also conceded that a child should forego any recovery if such recovery would unduly impair discipline and destroy the harmony of the family.* Ordinarily,

---

those decisions disagree with our holding here, we decline to follow them.

11. The Court has recognized three other limitations on the doctrine. First, the immunity does not apply to suits between a parent and an emancipated, adult child. *Waltzinger v. Birsner,* 212 Md. 107, 125–26, 128 A.2d 617 (1957). It also does not prevent a suit by a child against his parent's business partner for negligence committed in the operation of the parent's partnership. *Hatzinicolas v. Protopapas,* 314 Md. 340, 550 A.2d 947 (1988). In addition, the Court has declined to extend the doctrine to stepparents. *See Warren v. Warren, supra,* 336 Md. at 628–31, 650 A.2d 252.

the parent is not liable for damages to the child for a failure to perform a parental duty, or for excessive punishment of the child *not maliciously inflicted,* or for negligent disrepair of the home provided by the father. These acts grow out of and pertain to the relation of parent and child.

(Emphasis supplied.) Nevertheless, the Court concluded that the immunity did not bar the daughter's suit, because the policy underpinnings of the doctrine were not applicable:

In the case at bar the illegitimate daughter alleges in her declaration that her father murdered her mother and then committed suicide one week later. In these circumstances there can be no basis for the contention that the daughter's suit against her father's estate would be contrary to public policy, *for the simple reason that there is no home at all in which discipline and tranquility are to be preserved.*

*Id.,* 197 Md. at 67–68, 77 A.2d 923 (emphasis supplied). The Court later stated:

[W]hen, as in this case, the parent is guilty of acts which *show complete abandonment of the parental relation,* the rule giving him immunity from suit by the child, on the ground that discipline should be maintained in the home, cannot logically be applied, for when he is guilty of such acts he forfeits his parental authority and privileges, including his immunity from suit. *Justice demands that a minor child shall have a right of action against a parent for injuries resulting from cruel and inhuman treatment or for malicious and wanton wrongs.*

*Id.,* 197 Md. at 68, 77 A.2d 923 (emphasis supplied).

Our decisions have since guarded against interpreting *Mahnke* too broadly. In *Shell Oil Co. v. Ryckman,* 43 Md. App. 1, 4, 403 A.2d 379 (1979), we stated that *Mahnke* "presented an extreme set of facts" and its holding "should be narrowly construed." We thus declined to extend *Mahnke* to allow a counterclaim based on a father's alleged negligence toward his son committed when the father was also the son's employer. In *Montz v. Mendaloff, supra,* 40 Md.App. 220, 388 A.2d 568, we hesitated to extend *Mahnke* to cases of gross

negligence. Calling the contention "troublesome," we stated, first, that the facts alleged in the appellant's declaration—an automobile accident—bore "no resemblance to *Mahnke*." *Id.*, 40 Md.App. at 224, 225, 388 A.2d 568. We then held that the appellant's declaration insufficiently pleaded gross negligence, and that there was "nothing in the record showing the accident was caused by any action on the mother's part, *indicating her abandonment or forfeiture of her parental authority and privileges*." *Id.* at 225, 388 A.2d 568 (emphasis in original). We added, however, at 40 Md.App. at 224–25, 388 A.2d 568, that,

> it is conceivable that a set of circumstances could exist wherein one could say that the acts of the parent were grossly negligent and which show a complete abandonment of the parental relation, or by which it might be said that the parent had forfeited his parental authority and privileges, and thus his immunity from suit, so as to bring the case within the narrow confines of *Mahnke v. Moore*.

Appellant contends that, as a matter of law, his conduct was not within the *Mahnke* exception. He focuses on the *Mahnke* Court's statement that the conduct of the father there "show[ed] complete abandonment of the parental relation," as well as its cautionary note that "a child should forego any recovery of damages if such recovery would unduly impair discipline and destroy the harmony of the family." *Mahnke*, 197 Md. at 68, 77 A.2d 923. Appellant argues that he has not abandoned the parental relation with his children, because he cared for them after his wife's death, made arrangements for their care and support during his incarceration, and wants to be reunited with them upon his release. He further contends that, because he intends to rejoin his children, their suit against him "would unduly impair discipline and destroy the harmony of the family." He claims, therefore, that the policies underlying parent-child immunity would be served by its application in this case.

We agree that *Mahnke* created only a narrow exception to parent-child immunity. Appellant's reading of the case

is too restrictive, however. The authorities establish that it is the *character of the parent's act* that is central to the determination of *Mahnke*'s applicability, and not just the parent's feelings or intentions with respect to the child. The message of *Mahnke* is clear: "Justice demands that a minor child shall have a right of action against a parent for injuries resulting from *cruel and inhuman treatment* or for *malicious and wanton wrongs.*" *Id.*, 197 Md. at 68, 77 A.2d 923 (emphasis supplied). *See also Warren v. Warren, supra,* 336 Md. at 625, 650 A.2d 252 (*Mahnke* stands for the proposition that "a minor child who has suffered harm from cruel, inhuman, or outrageous conduct at the hands of a parent may bring suit for monetary damages"); *Hatzinicolas v. Protopapas, supra,* 314 Md. at 356, 550 A.2d 947 ("*Mahnke v. Moore* . . . carved out of the parent-child immunity an exception under which a minor child has a right of action against a parent for injuries resulting from cruel and inhuman treatment or for malicious and wanton wrongs."); *Frye v. Frye, supra,* 305 Md. at 546–47, 505 A.2d 826 ("In *Mahnke v. Moore,* . . . [w]e also departed from the absolute rule of *Hewlett* in holding that a minor child had a right of action against the father for cruel and inhuman treatment or for malicious and wanton wrongs."). Moreover, in the earlier case of *Yost v. Yost, supra,* the Court distinguished "acts of passive negligence incident to the parental relation," for which there could be no liability, and "overt acts of tort." *Yost,* 172 Md. at 134, 190 A. 753.

In our view, the *Mahnke* Court's reference to "complete abandonment of the parental relation" refers to conduct that, by its nature, constitutes an abandonment of the parental relation, without regard to the parent's intentions toward the child. *See Shell Oil Co. v. Ryckman, supra,* 43 Md.App. at 4, 403 A.2d 379 (stating that the father's acts in *Mahnke* "*represented* a complete abandonment of the parental relationship" [emphasis supplied] ). Thus, a parent who commits an atrocious, outrageous or wanton wrong that injures the child forfeits the State-conferred privilege of parent-child immunity.

Courts in other jurisdictions have adopted the same view. For example, in *Dunlap v. Dunlap*, 84 N.H. 352, 150 A. 905 (1930), which the Court of Appeals discussed in *Mahnke*, the New Hampshire Supreme Court stated the following about parent-child immunity:

On its face, the rule is a harsh one. It denies protection to the weak upon the ground that in this relation the administration of justice has been committed to the strong and that authority must be maintained. It should not be tolerated at all except for very strong reasons; and it should never be extended beyond the bounds compelled by those reasons.

*Id.*, 150 A. at 909 (quoted in *Mahnke*, 197 Md. at 67, 77 A.2d 923). After recognizing the validity of the doctrine, the court also said, at 150 A. at 909:

But there is such a thing as abandonment of the parental relations. This may be shown to have come about by express agreement, *or may be implied from acts.* [Citations] *It should be implied in the case of malicious injuries.* Such acts are in no way referable to the parental status, *and they indicate its abandonment more clearly than words.*[12]

Also instructive is *Doe v. Holt*, 332 N.C. 90, 418 S.E.2d 511 (1992), in which the North Carolina Supreme Court held that parent-child immunity did not bar a suit by two minor children against their father for repeated rapes and sexual molestation.[13] The court concluded that the immunity did not apply to "actions by unemancipated minors to recover for injuries resulting from their parent's willful and malicious acts." *Id.*,

---

12. In 1966, the New Hampshire Supreme Court carved out an exception to parent-child immunity for motor torts. *See Briere v. Briere*, 107 N.H. 432, 224 A.2d 588 (1966).

13. Like this Court and the Court of Appeals, the North Carolina Supreme Court has declined to abrogate parent-child immunity by judicial decision. *See Lee v. Mowett Sales Co.*, 316 N.C. 489, 342 S.E.2d 882 (1986). The North Carolina legislature, however, has enacted an exception to the doctrine for actions "arising out of the operation of a motor vehicle owned or operated by the parent or child." N.C. GEN. STAT. § 1–539.21 (Supp.1995).

418 S.E.2d at 514. It stated: "It would be unconscionable if children who were injured by heinous acts of their parents such as alleged here should have no avenue by which to recover damages in redress of those wrongs." *Id.,* 418 S.E.2d at 514–15.

The court appeared to focus on the parent's tortious act, and not on the parent's other conduct or intentions. Indeed, the court stated that willful and malicious torts were actionable because they carried their own indicia of parental abandonment and destruction of the family relation: "Where a parent has injured his or her child through a willful and malicious act, any concept of family harmony has been destroyed. Thus, the foremost public purpose supporting the parent-child immunity doctrine is absent, and there is no reason to extend the doctrine's protection to such acts." *Id.,* 418 S.E.2d at 515. *See also Henderson v. Woolley,* 230 Conn. 472, 644 A.2d 1303 (1994) (parent-child immunity does not bar action against parent for sexual abuse or exploitation; "Familial discord obviously exists where parental abuse occurs. Therefore, the purpose of the preservation of family harmony cannot justify immunity in the case of sexual abuse by a parent."). *But cf. Richards v. Richards,* 599 So.2d 135 (Fla.Dist.Ct.App.), *rev. dismissed,* 604 So.2d 487 (Fla.1992) (parent-child immunity bars child's suit for intentional tort by parent).

Similarly, in *Henderson v. Henderson,* 14 Fla.Supp. 181 (1958), a Florida court allowed a wrongful death action by a four-year-old boy against his father, alleging that the father had "willfully, wantonly and intentionally shot and killed his mother." The court stated:

It is generally a wholesome rule to grant the parent immunity from unintentional or negligent personal torts which occur within the scope of domestic relations. The security, peace and tranquility of the home, being the very foundation upon which our society rests, must be protected. *But where one parent deliberately and willfully shoots and kills the other parent as alleged in this complaint[,] thereby not only breaking up the family unit but also depriving the child of the support, care, guidance, comfort and companionship of*

*the other parent, he forfeits all claim to immunity.* .... It would be a distinct disservice not only to the family, but also to the state, to place the court's stamp of approval upon the individual who betrayed his trust by maliciously causing injury to his child or ward.

*Id.,* 14 Fla.Supp. at 185 (emphasis supplied).[14]

These cases confirm our view that the issue here is not whether appellant abandoned his children, or even whether he intends to attempt to re-create the family relation. Rather, the question here is whether appellant injured his children by a tortious act that constituted cruel or inhuman treatment or a wanton and malicious wrong. Our conclusion also coincides with the reasoning of the Alabama Supreme Court in *Hurst v. Capitell,* 539 So.2d 264, 266 (Ala.1989), a case involving a parent's assistance of sexual abuse of a child: "To leave children who are victims of such wrongful, intentional, heinous acts without a right to redress those wrongs in a civil action is unconscionable, especially where the harm to the family fabric has already occurred through that abuse ... [and, therefore,] the purpose for that immunity is no longer served."

### B.

We must next address appellant's claim that the trial court erred in denying his motions for judgment. The standard of our review is well settled. Our task is to determine whether the record contains *any* legally relevant and competent evidence, however slight, to allow a rational factfinder to infer the fact in issue. *General Motors Corp. v. Lahocki,* 286 Md. 714, 733, 410 A.2d 1039 (1980); *Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 328, 389 A.2d 887 (1978); *Market Tavern, Inc. v. Bowen,* 92 Md.App. 622, 650, 610 A.2d 295, *cert. denied,* 328 Md. 238, 614 A.2d 84 (1992). In making this determination, we must view the evidence, and all reasonable inferences from that evidence, in the light most

---

14. In 1982, the Florida Supreme Court abrogated parent-child immunity in cases involving motor torts, but only to the extent of the defendant's insurance. *Ard v. Ard,* 414 So.2d 1066 (Fla.1982).

favorable to the party against whom the judgment was sought. *Twelve Knotts Limited Partnership v. Fireman's Fund Insurance Co.*, 87 Md.App. 88, 98, 589 A.2d 105 (1991). Moreover, our task is not to weigh the evidence, but only to assess its legal sufficiency. *See also Bartholomee v. Casey*, 103 Md.App. 34, 51, 651 A.2d 908 (1994), *cert. denied*, 338 Md. 557, 659 A.2d 1293 (1995) ("a party is entitled to a directed verdict . . . when the evidence at the close of the case, taken in the light most favorable to the nonmoving party, does not legally support the nonmoving party's claim or defense").

In this case, the Calhoun children asserted that appellant deliberately killed their mother; they offered substantial evidence in support of their claim, which we need not repeat here. Nevertheless, appellant steadfastly claimed that the death was accidental and that he did not intend to kill his wife. Calhoun also categorically denied striking his wife in the head with a two-by-four. He testified, in part:

> So she started to climb up the ladder and I was going to hand the bucket up to her. And we were talking as she was going up the ladder and I made a comment. Not a sarcastic one. It was one in kind of fun, I guess, funny. And in response she said something about Lancaster which is where we went to kind of get away for a weekend. And I was mad at myself because of what had happened earlier. I done something behind my wife's back that I wasn't proud of and took her to Lancaster on a shopping trip to kind of make up and she knew more than I thought she did about the situation. And I was disappointed in myself *and the kick to the ladder wasn't for her, it was for me and I, to this day I don't—I never expected to have happen what happened, and that's the God's honest truth.*

(Emphasis supplied.)

■ Of course, longstanding rules of appellate procedure provide that the determination of the credibility of witnesses is an issue for the factfinder. *See Peroti v. Williams*, 258 Md. 663, 670, 267 A.2d 114 (1970); *Industrial Service Co. v. State, to Use of Bryant*, 176 Md. 625, 637–38, 6 A.2d 372 (1939);

*Jones Holloware Co. v. Hawkins,* 128 Md. 160, 164, 97 A. 365 (1916); *Garrison v. Shoppers Food Warehouse,* 82 Md.App. 351, 571 A.2d 878 (1990); *Link v. Hutzler Bros. Co.,* 25 Md.App. 586, 596, 335 A.2d 192 (1975). It is not our role to comb the cold, appellate record and decide for ourselves which witnesses to believe and which witnesses to disbelieve. Given the evidence presented by appellee, and notwithstanding the viability of the parent-child immunity doctrine, the evidence was sufficient to generate an issue as to the applicability of the *Mahnke* exception. Therefore, we conclude that the trial court correctly denied appellant's motions for judgment.

## IV.

We turn next to the jury's inability to reach a verdict on Question 2 of the verdict sheet, which asked it to determine whether "the wrongful act or acts of the Defendant, John C. Calhoun[,] were atrocious, show a complete abandonment of the parental relation, were intentional, were willful and were malicious." The instruction was apparently intended to track the *Mahnke* exception to parent-child immunity.

In overruling appellant's objection to Question 2, the judge stated, "My interpretation is, it should be in there according to the statute in [*Mahnke*]." Nevertheless, the judge found the jury's inability to reach a verdict on the question to be of no consequence, and denied appellee's request to resubmit the question to the jury in five different parts. The court stated that the jury only needed to determine whether there was a "wrongful act."

We observe that plaintiff had the burden to prove that appellant's conduct fit within the exception. *Cf. Doe v. Holt, supra,* 418 S.E.2d at 514 (analyzing whether children's complaint sufficiently pleaded willful and malicious act in order to fit within exception). Appellant was not required to prove that his conduct was not wanton and malicious. As appellant maintained that his wife died accidentally, the circumstances of Ms. Calhoun's death was a matter for the jury to resolve. Moreover, even if we assume, as we did in *Montz*

*v. Mendaloff, supra,* 40 Md.App. at 224–25, 388 A.2d 568, that gross negligence could, under some circumstances, be of such a character as to show a complete abandonment of the parental relation, the jury was not required to conclude that Calhoun's admission that he kicked the ladder was so far from the standard of care as to fall within that range.[15] Therefore, the trial judge should not have ruled at the close of plaintiff's case, as a matter of law, that the *Mahnke* exception applied.

 It is apparent, then, that the jury's inability to reach a verdict on Question 2 was of critical importance with respect to the applicability of the parent-child immunity doctrine. Rule 2–522 provides, in relevant part: "The verdict of a jury shall be unanimous unless the parties stipulate at any time that a verdict or a finding of a stated majority of the jurors shall be taken as the verdict or finding of the jury." Calhoun argues that this inability means that the *Mahnke* exception does not apply. We disagree. A jury's deadlock on a particular question is not the same as a finding in favor of one party or another.

 Appellee suggests that we may evaluate the facts on our own and determine whether *Mahnke* applied. He also argues that "[t]he fact that the jury failed to reach a verdict

---

**15.** " 'Gross negligence is a technical term; it is the omission of that care which even inattentive and thoughtless men never fail to take of their own property, it is a violation of good faith. . . . It implies malice and evil intention.' " *Foor v. Juvenile Services Administration,* 78 Md.App. 151, 170, 552 A.2d 947, *cert. denied,* 316 Md. 364, 558 A.2d 1206 (1989) (quoting *Bannon v. Baltimore & Ohio Railroad Co.,* 24 Md. 108, 124 (1866)). It is

an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them. Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist.

*Romanesk v. Rose,* 248 Md. 420, 423, 237 A.2d 12 (1968) (quotation omitted). "What constitutes gross negligence is generally to be determined on the consideration of all the facts in the particular case." *White v. King,* 244 Md. 348, 360, 223 A.2d 763 (1966).

on Question No. 2 substantiates nothing more than the fact that six individuals were unable or unwilling to find each and every element as listed in Question No. 2 to be present in the facts in this case." We disagree with both contentions. In light of the conflicting evidence, the issue was one of fact for the jury to resolve. Because the jury was unable to reach a verdict on Question 2, a mistrial should have been declared. Moreover, appellee apparently implies that not all parts of the question were necessarily needed in order to constitute a finding that appellant had committed "cruel and inhuman treatment" or a "malicious and wanton" wrong within the meaning of *Mahnke*. We cannot revise here the question that actually was presented to the jury. Nor can we speculate as to what the jury would have found if, as appellee initially requested, Question No. 2 were re-submitted to the jury as five separate questions. What we do know is that no finding was made as to whether appellant's conduct was atrocious, wanton or inhuman.

In view of the foregoing, the judgment must be reversed, and the case remanded for a new trial.

### CONCLUSION

We hold that the doctrine of parent-child immunity applies in a wrongful death action in which a child sues a parent for the death of the other parent. Nevertheless, in this case, the evidence was sufficient to generate a jury question as to whether appellant's conduct constituted a wanton and malicious wrong, outside the protection of parent-child immunity. Finally, we conclude that the jury's inability to reach a verdict with respect to the character of appellant's conduct necessitates a new trial.

**JUDGMENT REVERSED. CASE REMANDED FOR A NEW TRIAL.**

**COSTS TO BE EQUALLY DIVIDED BETWEEN APPELLANT AND APPELLEE.**